## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| UAL CORPORATION, et al., | ) |
| | ) |
| Debtors/Appellees, | ) |
| | )　**Case No. 04 C 5105** |
| ———————————————————— | ) |
| | )　**Honorable John W. Darrah** |
| UAL CORPORATION, et al., | ) |
| | ) |
| Plaintiffs/Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| OURHOUSE, INC., | ) |
| | ) |
| Defendant/Appellant. | ) |

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the appeal of the judgment of the bankruptcy court on June 29, 2004, by OurHouse, Inc. For the reasons that follow, the decision of the bankruptcy court is affirmed.

### BACKGROUND

OurHouse, Inc. was a company in the business of selling goods and services through an Internet retail site. OurHouse is no longer in business. Debtor, UAL Loyalty Services, Inc., f/k/a United New Ventures, Inc. ("UNV"), is a wholly-owned subsidiary of UAL Corp., the operator of United Airlines, Inc., which UAL created to channel its Internet initiatives and investments. MyPoints.com, Inc. is an online loyalty program that provides consumers offers from retailers tailored to their lifestyles. By responding to such offers, members of MyPoints' database earn points redeemable for rewards, such as gift certificates and frequent-flier miles.

In December 2000, Peter Stelian, then the chief financial officer of OurHouse, developed the idea of acquiring an online marketing company to provide a more focused way for OurHouse to obtain new customers at a relatively low cost. Stelian analyzed publicly-traded online marketing companies and identified MyPoints as an attractive acquisition target.

Stelian conceived the idea of OurHouse's joining with a major airline to purchase MyPoints. In early January 2001, Stelian approached Richard Poulton of UNV to discuss the concept of OurHouse's and UNV's pursuing a joint acquisition of MyPoints. Poulton was a former OurHouse employee who had since become the chief financial officer of UNV. UNV had not previously considered acquiring MyPoints. After Stelian explained to Poulton what he had learned about the MyPoints business, Poulton expressed interest in the idea of purchasing a joint acquisition and sought more information.

Thereafter, OurHouse made available to UNV confidential and proprietary background material concerning MyPoints, including OurHouse's own detailed analysis of MyPoints' business and demographic information, data analyses about the company and its value, and confidential details of conversations Stelian had with members of MyPoints' management and board regarding, among other things, the fact that MyPoints was willing to entertain an acquisition offer.

By January 11, 2001, OurHouse and UNV exchanged an initial draft agreement concerning the purchase of MyPoints and related matters. By late January 2001, Poulton was strongly encouraging OurHouse to pursue the acquisition. Poulton told Stelian that UNV was not prepared to undertake a hostile acquisition because UAL was, at the time, attempting to acquire another airline, U.S. Airways, and did not want the additional scrutiny from the U.S. Department of Justice that would result from UAL's directly pursuing a hostile acquisition of MyPoints. Accordingly,

Poulton told Stelian that he preferred the idea of OurHouse's acquiring MyPoints and then selling a majority of the business to UAL after the acquisition.

On or about February 5, 2001, UNV and OurHouse signed an agreement setting out an integrated plan for the acquisition of MyPoints, the subsequent allocation of the ownership of MyPoints between OurHouse and UNV, and the operation of MyPoints for the mutual benefit of both parties. The agreement provided that: (1) OurHouse would be the entity that would make an offer for the acquisition of MyPoints; (2) upon completion of such acquisition, OurHouse would be entitled to "distribute" to itself certain specified amounts from MyPoints' cash accounts in order to recoup a portion of the purchase price; (3) UNV would, through a series of steps, including a payment of $10 million to OurHouse, acquire a majority stake in MyPoints, with OurHouse retaining a minority stake; and (4) UNV would thereafter deliver to OurHouse certain marketing rights. The agreement also included provisions prohibiting either party from using "Confidential Information" provided by the other party for its own benefit.

OurHouse, with UNV's knowledge and encouragement, acquired 774,000 shares of MyPoints' stock at a total cost of $1.2 million. OurHouse made this investment to enhance its credibility and influence with the MyPoints board of directors.

Between February 5, 2001 and March 5, 2001, OurHouse and UNV undertook a number of actions to facilitate the MyPoints acquisition. Among those efforts was participation in a February 16, 2001 conference call between Stelian, Poulton, and the new chief executive officer of MyPoints, John Fullmer. During the call, Poulton explained that UAL was not acquiring MyPoints directly because it had been OurHouse's idea to acquire the company, OurHouse had talented people

-3-

and could move more quickly than UAL to consummate a transaction, and UAL wanted to "fly under the radar" of the Department of Justice while its proposed acquisition of U.S. Airways was pending.

On March 1, 2001, Stelian met with Poulton, UNV President Doug Hacker, and senior MyPoints executives, including John Steuart. Stelian explained the interest of OurHouse and UNV in acquiring MyPoints and explained the form that the proposed transaction would take. When asked again why UAL was not acquiring MyPoints directly, Poulton reiterated the reasons he had set forth earlier. MyPoints' management expressed enthusiasm regarding the proposed acquisition.

On March 5, 2001, Stelian sent a letter to Fullmer, stating that OurHouse had an interest in acquiring MyPoints for $120 million and that OurHouse had an agreement with UNV that required UNV, in connection with an acquisition of MyPoints, to invest capital and other resources to create a successful online loyalty-rewards business. Prior to sending the letter, Stelian sent it to Poulton, who reviewed it as of March 5, 2001.

On or about March 14, 2001, Poulton and Stelian attended a meeting of the MyPoints board in order to present their acquisition proposal. With input from Poulton, Stelian delivered a presentation he had prepared to the MyPoints board. In response to questions from board members, Poulton explained why, for certain strategic and public relations reasons, neither UNV nor UAL would directly participate in the proposed tender offer for MyPoints. Poulton confirmed that UNV would have a role in the transaction and made statements to the board about the financial capability of UNV.

After the meeting, Fullmer contacted Stelian. As a result of that conversation, on or about March 21, 2001, Stelian told Poulton that the parties could proceed with due diligence. Poulton insisted that the February 5 agreement be changed because Poulton was convinced that the

-4-

acquisition would not succeed unless UNV increased its involvement. On March 22, 2001, Poulton sent Stelian an email, stating, "We need to come to an agreement on our revised L.O.I. before we visit the Blue [MyPoints] team week after next. Specifically, we need to document your expected contribution, revise ownership provision[s] and clean up some of the operating agreement provisions. I'll send you proposed revisions tomorrow."

Around this same time, Poulton advised his boss, Hacker, that he believed he could negotiate OurHouse's equity out of the agreement. Hacker said this was part of Poulton's efforts to convince Hacker that he should increase UNV's "modest" expected contribution of $20 million to something greater.

On March 26, 2001, Poulton sent Stelian a draft revised agreement. In the e-mail message accompanying the draft agreement, Poulton stated that the parties must resolve the agreement before due diligence commences and noted that he modified the agreement to reflect, among other things, the "elimination of OurHouse equity," as well as "your [OurHouse] $10 million contribution." The next day, Poulton again e-mailed Stelian and affirmed that "You [OurHouse] will receive a perpetual marketing right for a fee." Poulton reiterated that OurHouse would not receive any equity and that UNV was "no longer interested in having outstanding minority interest." Poulton told Stelian, "I'm not trying to sound like a take-it-or-leave-it prick, but the term sheet I sent you was not intended to start a negotiation."

On April 4, 2001, Stelian met with Poulton and Hacker at UAL's offices. Hacker testified that he was aware of Stelian's concern that UNV might alter the agreement again and that Stelian "wanted assurances . . . that we would not squeeze him again." In the face of UNV's demands, OurHouse analyzed the value of the marketing rights and concluded that it was worth renegotiating

the February 5, 2001 agreement and committing a $10 million contribution in exchange for the marketing rights.

On or about April 9, 2001, UNV and OurHouse executed the revised agreement, dated April 5, 2001 ("April agreement"). By its terms, the April 5 agreement purported to modify and replace the February 5, 2001 agreement. Poulton was the sole representative of UNV involved in negotiating the terms of the revised agreement with OurHouse.

Under the April agreement, OurHouse would be permitted to withdraw $70 million from MyPoints' cash holdings but would ultimately retain no equity in the company. The agreement provided that UNV would buy all of MyPoints' stock OurHouse acquired for $10 million. Accordingly, OurHouse was required to make a $10 million contribution to achieve the expected required amount of $90 million ($70 million in cash from MyPoints, $10 million from UNV, and $10 million from OurHouse).

Paragraph 1 of the April agreement provided, in pertinent part:

> 1. (a) Upon a successful acquisition of Blue [MyPoints], OurHouse will arrange to make a cash distribution from Blue to OurHouse . . . of an amount equal to the lessor of: (i) $70 million dollars; and (ii) the aggregate offering price paid for the acquisition of Blue minus $20 million.
>
> . . .
>
> (b) Immediately following the distribution specified in paragraph (a) above, UAL will purchase from OurHouse all of the outstanding shares of Blue held by OurHouse for $10 million dollars.

Poulton drafted Paragraph 2(c) of the revised agreement, which provided:

> Subsequent to completion of the Operating Agreement, OurHouse shall not have the right to assign the Operating Agreement in connection with the sale of its business within 6 months of the signing of this agreement unless expressly approved in advance by UAL, whose approval shall not be unreasonably withheld.

It was important to Stelian that OurHouse have the flexibility to use the marketing rights to benefit OurHouse or to sell them in connection with a sale of the business. OurHouse had put together a target list of companies to which OurHouse could potentially sell its business. OurHouse executives discussed with members of its board the possibility of selling the marketing rights.

A new provision in the April 2001 agreement, paragraph 2(d), provided, in pertinent part:

> The provisions of the Operating Agreements outlined above will be applied, without modification, even if UAL, in its sole discretion, decides to participate in the direct acquisition of Blue (the 'Acquisition Contribution'), provided the amount of such Acquisition Contribution does not exceed $20 million dollars, and provided OurHouse complies with all other terms and conditions outlined in this letter.

The term "Acquisition Contribution" was defined to mean the amount UNV paid to "participate in the direct acquisition of [MyPoints]," but the contract did not explain how that amount should be calculated.

Poulton was the sole drafter of paragraph 2(d). Poulton and Hacker had internal discussions about UNV's acquiring MyPoints directly prior to executing the April 5, 2001 agreement. According to Poulton, paragraph 2(d) provided a "second pathway" for commencing an acquisition. Poulton stated that paragraph 2(d) provided OurHouse with a "safety net" that was intended to make OurHouse "feel comfortable" that there would be no renegotiation of the marketing rights that OurHouse was to receive in the event that UNV decided to acquire MyPoints directly. Poulton interpreted paragraph 2(d) to mean that if UNV "decided to proceed and perform a direct acquisition . . ., if the net investment was less than $20 million, then we would . . . negotiate operating agreements around the parameters outlined in [the April 5] letter."

The April agreement also set forth the perpetual marketing rights that OurHouse would receive upon the closing of the transaction, which included the right to send targeted email messages once each week to each of the approximately 16 million members of MyPoints database.

As in the February 2001 agreement, the April agreement contained a confidentiality agreement that bound both UNV and OurHouse not to reveal to third parties confidential information disclosed during the course of their discussions about the MyPoints acquisition. "Confidential Information" was defined as information "pertaining to the disclosing party which the disclosing party deems proprietary and confidential."

On April 19, 2001, MyPoints' general counsel wrote a letter to Stelian (with a copy to Poulton) asking Stelian to provide certain information pertaining to the proposed acquisition, including the form of the completed transaction. MyPoints again asked for a description of UNV's involvement and emphasized that one of MyPoints' "primary concerns" was that the financing be in place to complete the agreement. Stelian had already told Poulton (in March 2001) that the maximum OurHouse could invest toward the acquisition of MyPoints was $10 million. Under those circumstances, Poulton had concluded that the only way to close the deal would be to have UNV be the acquirer.

On that same day, MyPoints' general counsel telephoned Stelian and informed him that MyPoints' outside counsel had concluded that UNV's role in the proposed transaction would have to be mentioned in the Security and Exchange Commission disclosure statements, even if OurHouse was the entity actually making a tender offer for MyPoints. According to MyPoints' general counsel, this was because, under the April agreement, ownership of MyPoints would be "flipped" by OurHouse to UNV.

On Friday, April 20, 2001, Stelian told Poulton about his conversation with MyPoints' general counsel. Later that day, Poulton informed Stelian that UNV would acquire MyPoints directly, thereby bringing into play paragraph 2(d). On Monday, Stelian informed the OurHouse board what Poulton had told him.

Thereafter, Poulton negotiated with MyPoints for the direct acquisition of MyPoints' stock. On April 26, 2001, Poulton informed Stelian that UNV had agreed with MyPoints to acquire the company at $112.5 million. Poulton told Stelian to begin drafting the operating agreement that would implement the marketing rights OurHouse was to receive under the April agreement.

On April 30, 2001, MyPoints and UNV entered into a preliminary agreement for UNV to acquire all of MyPoints' stock for $112.5 million.

On or about May 17, 2001, UAL, UNV's parent company, held a meeting of its board of directors at which the proposed MyPoints acquisition was presented for approval. Both Poulton and Hacker attended the meeting. There, in Poulton's presence, Hacker summarized the deal by explaining to the board that UNV planned a $112 million tender offer and that UNV's "net cost" would be $40 million as a result of excess MyPoints cash and a "$10 million commitment from our first marketing partner to be funded at the time of acquisition."

On or about June 4, 2001, UNV issued a news release announcing that MyPoints had agreed to be purchased by UNV, subject to "customary conditions," including the valid tender of at least a majority of MyPoints' outstanding shares, for a per share price of $2.60.

Thereafter, OurHouse continued to take the steps it believed were necessary to perform under the April agreement. Among other things, OurHouse retained outside counsel to assist in the

drafting of the operating agreement. Stelian continued attempting to reach Poulton to discuss the draft operating agreement and other related issues.

On June 19, 2001, Poulton left Stelian a voicemail message stating, among other things, that the parties "should certainly start sharing documents" and that OurHouse should "spell out pretty clearly what you need" in any operating agreement. Poulton also stated that he and Stelian should "make sure we both understand what we think . . . we signed up to in our L.O.I." and mentioned OurHouse's "associated contribution" due at the closing.

During a June 28, 2001 telephone conversation, Poulton told Stelian that OurHouse should have direct discussions with MyPoints' management team with respect to the operating agreement to implement the marketing rights. Immediately thereafter, Stelian contacted MyPoints' executive, John Steuart. However, Steuart told Stelian that he believed OurHouse's agreement with UNV to get marketing rights was unenforceable and told Stelian that OurHouse would receive the marketing rights outlined in that agreement "over his dead body."

On Friday, June 29, 2001, OurHouse delivered to UNV copies of a draft operating agreement reflecting the parties' prior agreement as to the marketing rights that OurHouse was to receive. Upon receipt of the draft, Poulton advised Stelian that OurHouse should e-mail the draft operating agreement to MyPoints' senior executives, including Steuart, who would review the draft over the weekend and respond by Monday, July 2, 2001. Poulton and Stelian agreed to meet on July 3, 2001.

Also on June 29, 2001, Stelian sent Hacker and Poulton a letter seeking assurances that UNV intended to "live up to its binding obligations under the April 5 agreement." UNV never provided a written response.

On July 2, 2001, Stelian telephoned Steuart. Steuart informed Stelian that he had not yet received the draft operating agreement. Later, Poulton telephoned Stelian and advised him that their scheduled July 3, 2001 meeting was canceled; that Steuart would not speak with OurHouse later that day with respect to the marketing rights or the operating agreement; and that UNV was cutting off all communications with OurHouse.

UNV did not allow OurHouse to make any contribution to the MyPoints acquisition. On July 5, 2001, UNV Acquisition Corporation filed Amendment No. 3 to its Tender Offer with the SEC. The Amendment, signed by Poulton, publicly disclosed the existence of the February and April agreements but expressed UNV's position that none of the agreements or arrangements between the parties granted OurHouse any right to participate in the acquisition of MyPoints, to obtain the marketing rights, or to market OurHouse's products and services to MyPoints' members in any way, shape or form after the acquisition.

The tender offer for MyPoints was successful, and MyPoints became a wholly-owned subsidiary of UNV. The acquisition was concluded on July 20, 2001, with UNV's incurring a total acquisition cost of approximately $118 million. At the time of closing, MyPoints had approximately $85 million in unencumbered cash.

Later that year, OurHouse filed suit against UNV in Illinois state court under various legal theories, including breach of contract, equitable estoppel, unjust enrichment, and tortuous interference with prospective business advantage. Before the matter could be tried in state court, the United States Bankruptcy Court for the Northern District of Illinois issued a stay in connection with the bankruptcy proceeding of UAL and its subsidiary, UNV.

On May 27, 2003, OurHouse timely filed its Proof of Claim in the bankruptcy court, alleging that UNV was liable to OurHouse for the reasons set forth in its state court complaint. On February 5, 2004, the bankruptcy court entered a Stipulation and Order, setting forth OurHouse and the Debtors' agreement to a three-day bench trial that would result in a final determination of the allowance or disallowance of OurHouse's claim.

## BANKRUPTCY COURT RULING

The three-day bench trial was held on April 26 through April 28, 2004. On June 29, 2004, the bankruptcy court issued its Findings of Fact and Conclusions of Law, disallowing OurHouse's claim in its entirety.

During the trial, OurHouse claimed that UNV improperly acquired MyPoints for itself, breaching a contractual duty of confidentiality to OurHouse or tortiously interfering with a prospective business advantage of OurHouse. OurHouse also claimed that after acquiring MyPoints, UNV improperly refused to grant OurHouse certain marketing rights in MyPoints, under three alternate theories: (1) that the refusal breached a contractual obligation to grant marketing rights, (2) that UNV was equitably estopped from refusing the rights, or (3) that the refusal resulted in UNV's being unjustly enriched. UNV disputed all of these claims and the extent of damages, if any, arising under any of these theories.

The bankruptcy court found that the confidentiality clause of the agreement was added by a lawyer for OurHouse. The confidentiality clause contained "the relevant provisions of UAL's standard form confidentiality agreement." There was no evidence that Stelian and Poulton ever discussed these provisions; and the provisions were included unchanged in the final form of the February agreement. The confidentiality provisions of the February agreement were simply repeated,

-12-

with no indication that they were ever the subject of negotiation or discussion, in the April agreement.

At trial, Stelian testified that Poulton and he agreed that an acquisition by UNV of MyPoints would provide OurHouse with the marketing rights specified in the April agreement in exchange for a $10 million payment by OurHouse at the time of the acquisition. In support of his testimony, OurHouse relied on an email that Stelian sent to OurHouse personnel on April 23 (three days after UNV's decision to pursue a direct acquisition), in which Stelian wrote that Poulton "has committed to not renegotiate our agreement prior to a closing even though they are going over the $20 mm investment amount on their end" and, in further support, a presentation made to the UAL board on May 17, which referenced a reduction in the cost of acquiring MyPoints due to a "$10 million commitment from our first marketing partner to be funded at the time of the acquisition."

In contrast, Poulton testified that after UNV decided on a direct acquisition, he merely assured Stelian that UNV would not "cut [OurHouse] out entirely" but would "do a new agreement" with them, based on a $10 million payment that, according to Poulton, was the most that OurHouse could expend for that purpose. This testimony was corroborated by a voice-mail message that Poulton left for Stelian on June 19, in which he responded to requests by Stelian for negotiating an operating agreement in such a way that did not suggest the parties were operating under a binding agreement. Poulton's testimony was also corroborated by a June 8 presentation to OurHouse's board of directors, which stated that in negotiating the proposed marketing agreement with MyPoints, OurHouse's "leverage with UAL is limited beyond our ability to withhold our $10 million investment" with no mention made of any binding commitment on the part of either party.

-13-

The bankruptcy court found that a critical fact in resolving this conflict was that OurHouse did not authorize any payment for marketing rights in MyPoints until June 20 – nearly two months after the discussion between Stelian and Poulton – and that, even then, the approval was contingent. The bankruptcy court concluded that OurHouse never understood that it was obligated to pay $10 million for marketing rights that would be negotiated in good faith. Instead, it put itself into a position to make that payment in the event that an acceptable agreement could be negotiated, retaining the option (its "leverage") of refusing to make any payment if it could not negotiate a satisfactory agreement. The "commitment" of OurHouse to make a $10 million payment at the time of the acquisition was a position in open negotiations, not a contractual obligation.

The bankruptcy court found that the central objective of the April agreement was for UNV to obtain complete control of MyPoints subject to an operating agreement, to be negotiated in good faith, giving OurHouse defined marketing rights. The agreement provided two alternate methods to accomplish this purpose. Under the first method, set out in paragraph 1, OurHouse would acquire the stock of MyPoints, distribute to itself a maximum of $70 million, then transfer the stock to UNV in exchange for a payment from UNV of $10 million, and receive an unconditional right to the operating agreement. Under the second method, set out in paragraph 2(d), UNV would acquire the MyPoints' stock directly; and OurHouse would be entitled to the operating agreement only conditionally – "provided that the amount of [UNV's] acquisition contribution does not exceed $20 million."

The bankruptcy court held that the most reasonable interpretation of the term "Acquisition Contribution," based on the context of the agreement and the parties' negotiation, was the amount in excess of $70 million that UNV would have to pay in order to acquire MyPoints. The bankruptcy

-14-

court found that Poulton and Stelian testified consistently on this point. The parties had agreed that $70 million was the most that should be withdrawn from MyPoints following an acquisition. As such, UNV would not have been required to use more than this amount of MyPoints' cash in effecting the acquisition itself. If OurHouse acquired MyPoints, UNV would receive all of the MyPoints' stock, depleted by a withdrawal of no more than $70 million, for a payment of $10 million to OurHouse; and OurHouse would have received the defined marketing rights. If UNV was the acquirer, UNV agreed to provide the defined marketing rights if it could similarly receive all of MyPoints' stock, depleted by a withdrawal of no more than $70 million, and pay an additional "Acquisition Contribution" of no more than $20 million.

The bankruptcy court also held that the breach of contract claim could not be sustained. First, there was nothing in the April Agreement that provided OurHouse with a right to contribute, and nothing in the conduct of the parties suggested that they understood such a right to exist. To the contrary, when Stelian learned that UNV was planning a direct acquisition of MyPoints, he recognized in a contemporaneous email message that UNV was "going over the $20 million investment amount on their end," removing OurHouse's contractual entitlement to the marketing rights by making an offsetting contribution to the acquisition. And, in the same email message, he sought Poulton's "commitment" not to renegotiate the marketing rights – apparently conceding that Poulton had no legal obligation to do so. As mentioned above, later Stelian recognized that OurHouse's leverage against UNV was limited to withholding $10 million, not contributing any larger amount.

Moreover, even if there had been an agreement that OurHouse could have made an additional contribution to reduce UNV's acquisition contribution to no more than $20 million, the bankruptcy

-15-

court found that OurHouse never attempted to make such a contribution; and it could not have done so. Given the ultimate acquisition cost of $118 million, OurHouse would have had to contribute $28 million to reduce UNV's contribution to the level at which UNV would arguably have been obligated to offer the defined marketing rights. Even at the $10 million price that the OurHouse board conditionally approved for purchase of these rights, OurHouse faced a $3 million cash shortfall, which would have been difficult to fill. Its total cash, as of June 30, 2001, was less than $25 million; and the most that Stelian testified could have been paid by OurHouse at the time of the acquisition was $18 million. A $28 million payment would not have been possible.

OurHouse appeals the bankruptcy court's ruling, arguing that the bankruptcy court erred: (1) in concluding that UNV did not breach its contract with OurHouse; (2) in concluding that OurHouse could not have performed under the contract; (3) in holding that OurHouse's damage analysis did not meet the standard of reasonable certainty and failed to establish any amount of damages suffered by OurHouse; and (4) in its alternative damage calculation by relying upon data that was not only unavailable at the time of the breach of contract but actually contradicts the data that was available at that time.

## DISCUSSION

A bankruptcy court's conclusions of law are reviewed *de novo*. *See Meyer v. Rigolon*, 30 F.3d 1375, 1378 (7th Cir. 1994). The Court reviews the bankruptcy court's factual findings for clear error. *See Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003). A finding of fact is clearly erroneous if, after reviewing the evidence, "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

Pursuant to Federal Rule of Bankruptcy Court 8013, a bankruptcy court's findings of fact "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Rule 8013 "does not permit a trier of fact to be overturned 'simply because [the appellate court] is convinced it would have decided the case differently.'" *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989). Instead, where two permissible conclusions may be drawn, the factfinder's choice cannot be clearly erroneous. *In re Weber*, 892 F.2d at 538. "Special deference must be accorded to credibility determinations 'for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.'" *In re Weber*, 892 F.2d at 538.

OurHouse first argues that the bankruptcy court erred in concluding that UNV did not breach its contract with OurHouse. OurHouse contends that the bankruptcy court's interpretation is contrary to the agreement, is contrary to the intent of the parties, and produces an absurd result.

If contract language is clear and unambiguous, the parties' intent must be ascertained from the plain language of the contract as a matter law. *See Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). A contract is not ambiguous simply because the parties do not agree as to its meaning. *See Installco Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002) (*Installco*). Contract language is only found to be ambiguous when it is reasonably susceptible to different constructions. *See Installco*, 336 Ill. App. 3d at 783. Whether the contract is ambiguous is determined from an examination of the instrument as a whole before any extrinsic evidence is considered. *See Installco*, 336 Ill. App. 3d at 783.

Under applicable Illinois law, whether a contract is ambiguous is a question of law. *See LaSalle Nat'l Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 145 (7th Cir. 1996) (*LaSalle*); *Countryman v. Industrial Comm'n*, 292 Ill. App. 3d 738, 740 (1997) (*Countryman*). Extrinsic evidence is not admissible in interpreting an unambiguous contract but is admissible to show the true meaning of an ambiguous contract. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003). If "the court concludes that the contract is ambiguous, the resolution of the ambiguity becomes a question of fact, to be decided by the trier of fact." *LaSalle*, 76 F.3d at 145.

OurHouse contends that the proper interpretation of "Acquisition Contribution" must include not only the purchase price and the $70 million cash available in the accounts of MyPoints but also the contribution to be made by OurHouse. Thus, UNV could not, consistent with its contractual obligations, calculate its "Acquisition Contribution" without giving OurHouse the opportunity to make its own contribution. Accordingly, with the purchase price of $118 million, so long as OurHouse was willing and able to contribute at least $28 million to the acquisition, UNV's "Acquisition Contribution" would be $20 million.

In the instant case, the bankruptcy court, while not explicitly stating that it found the contract ambiguous, relied upon extrinsic evidence when interpreting the contract. In interpreting the undefined term "acquisition contribution," the bankruptcy court not only looked to the context of the agreement but also to the parties' negotiations.

The parties concede that the April agreement does not define how UNV's Acquisition Contribution is to be defined or calculated. Furthermore, the term is reasonably susceptible to different constructions.

OurHouse concedes that paragraph 2(d) gave UNV the option to purchase MyPoints directly, instead of via a two-step transaction involving OurHouse's initial acquisition of MyPoints. OurHouse relies upon the April agreement's confidentiality clause as evidence that OurHouse had the right to contribute enough funds to insure that UNV's acquisition contribution would be $20 million. OurHouse contends that because UNV could not use the information it received from OurHouse for its own benefit, UNV could not unilaterally "hijack" information for its personal advantage and eliminate any benefit to OurHouse for a project conceived by OurHouse.

OurHouse's contention is not supported by the terms of the agreement, and the bankruptcy court's findings regarding a contrary interpretation were not clearly erroneous. Paragraph 2(d) specifically gave UNV the option to acquire MyPoints directly. Pursuant to paragraph 2(d), if UNV's Acquisition Contribution did not exceed $20 million, then OurHouse would receive certain marketing rights. However, neither the confidentiality clause nor any other specific clause of the April agreement provides that OurHouse be given the opportunity to contribute funds if UNV acquired MyPoints directly to insure that OurHouse receive certain marketing rights. Therefore, the bankruptcy court's construction of the agreement is supported by the evidence; and the bankruptcy court did not err in denying OurHouse's breach of contract claim based on UNV's alleged failure to allow OurHouse to contribute additional funds.

OurHouse contends that the bankruptcy court's interpretation yields the "ridiculous and inequitable result" that UNV had the unilateral power to deprive OurHouse of all of its contractual rights if UNV directly acquired MyPoints at a price over $90 million (over the $70 million from MyPoints and the $20 million from UNV provided in paragraph 2(d)). Such absurdity is further illustrated by the fact that at the time the parties entered into the April agreement, UNV knew that

OurHouse had sent MyPoints a letter offering $120 million for the company as of March 5, 2001; thus, both parties knew that there was no reasonable probability that the purchase price would be below $90 million.

The bankruptcy court's interpretation did not result in an absurd result because the April agreement simply gave each party the option to be the acquiring party and spelled out the consequences of each course of action. The April agreement did not require either party to acquire MyPoints, and it gave OurHouse no rights to interfere with UNV's acquisition if it decided to acquire MyPoints itself.

While the resulting agreed upon language of the contract may have produced a result unintended by OurHouse, such unintended result does not render the bankruptcy court's interpretation absurd. Contracts are interpreted to avoid absurd results. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002); *Epic Ins. Co. v. National Hosp. & Health Care Serv., Inc.*, 1994 WL 559103, at 21 n. 6 (N.D. Ill. 1994). Absurd results are results that the parties, presumed to be rational people pursuing rational ends, are very unlikely to have agreed to seek. *See Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). That is not the case here. Moreover, the court cannot rewrite the terms of a contract to reach what it believes is a more equitable result. *See Home Ins. Co. v. Chicago & Northwestern Trans. Co.*, 56 F.3d 763, 769 (7th Cir. 1995).

OurHouse next argues that the bankruptcy court erred in finding that even if the April agreement was interpreted to allow OurHouse to contribute the additional funds to reduce UNV's Acquisition Contribution to $20 million, OurHouse could not have performed. OurHouse contends

-20-

that the bankruptcy court's factual finding that OurHouse would have been unable to make the required $28 million payment was incorrect.

The bankruptcy court found that given the acquisition of $118 million, OurHouse would have had to contribute $28 million to achieve UNV's Acquisition Contribution of not more than $20 million ($118 million - $70 million (from MyPoints cash) - $20 million (UNV's Acquisition Contribution) = $28 million shortfall required to be paid by OurHouse. OurHouse contends that the bankruptcy court's calculation is incorrect because it fails to account for the $10 million UNV was required to contribute based on paragraph 1 of the April agreement. Under OurHouse's interpretation of paragraph 1 of the April agreement, even if UNV acquired MyPoints directly, UNV was required to pay OurHouse $10 million.

OurHouse's interpretation ignores that UNV was required to pay OurHouse $10 million if OurHouse acquired MyPoints. The paragraph immediately proceeding paragraph 1 states, in pertinent part, that the April agreement sets "forth the mutual understanding of OurHouse [and UNV] . . . following an acquisition of MyPoints.com, Inc. (Blue) by OurHouse." Pursuant to the agreement, UNV was not required to pay OurHouse $10 million if OurHouse did not acquire MyPoints. Accordingly, the bankruptcy court did not err in finding that the total amount tha would have been required of OurHouse to insure UNV's Acquisition Contribution be no more than $20 million was $28 million.

Furthermore, the bankruptcy court did not err in holding that OurHouse failed to prove that it could have made the $28 million payment. It found that OurHouse would not have been able to make the $28 million payment because Stelian testified the most OurHouse could have paid at the time of the acquisition was $18 million. In addition, at the $10 million price that the OurHouse

-21-

board conditionally approved, OurHouse faced a $3 million cash shortfall. Furthermore, OurHouse's total cash, as of June 30, 2001, was less than $25 million. OurHouse was not a successful enterprise which had never had a quarter in which it generated a profit; as early as October 2000, it was considering filing Chapter 11 bankruptcy; it was "burning" cash at a rate of more than $2 million per month; and in August 2001, OurHouse had ceased operations and liquidated. The bankruptcy court's findings were not clearly erroneous and were supported by the evidence at trial.

Based on the above, the bankruptcy court did not err in finding that OurHouse would have been unable to perform under the April agreement.

In light of the above findings, the Court need not address OurHouse's arguments relating to alleged errors in the bankruptcy court's finding that OurHouse failed to prove its alleged damages with reasonable certainty.

## CONCLUSION

Based on the foregoing, the June 29, 2004 judgment of the bankruptcy court order, disallowing OurHouse's claim, is affirmed.

Date: February 8, 2005

John W. Darrah, Judge
United States District Court